UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMERICAN PIE PIZZ, INC. f/k/a
AMERICAN PIE PIZZA AND SALADS,
INC.

          Plaintiff,

v.

HOLTON HOLDINGS, INC., doing business
as AMERICAN PIE PIZZA

          Defendant.

_____/

Case Number: 2:10-cv-13106

Paul D. Borman
United States District Judge

### ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

This matter comes before the Court on defendant Holton Holdings, Inc.'s ("Defendant") Motion to Dismiss, Stay, or Transfer. (Dkt. No. 6.) Plaintiff filed a response (Dkt. No. 11), and Defendant has filed a reply. (Dkt. No. 12.) A hearing was held on January 26, 2011 at 3:00 p.m. For the following reasons, the Court GRANTS Defendant's motion to dismiss because it lacks personal jurisdiction over Defendant.

**I.    BACKGROUND**

This action arises from American Pie Pizza, Inc's ("Plaintiff") claim that Defendant has been, and is currently infringing two of its trademarks based off the words "American Pie". (Pl.'s Resp. to Def.'s Mot. to Dismiss 4-5.) Plaintiff is a Michigan corporation, with its principal place of business in Warren, Michigan, and has operated or licensed three restaurants in southeast Michigan since 2006. (Pl.'s Resp. 2.) In conjunction with its restaurants, Plaintiff also operates a

website with the domain name www.americanpiepizzas.com. (Pl.'s Resp. Ex. A.)

On July 1, 2008, Plaintiff acquired three service trademarks (the "Marks")[1] formally registered by Unihost, Inc. ("Unihost") through a valid "Agreement to Assign Trademark Rights" that was formally recorded by the U.S. Patent and Trademark Office ("USPTO") on March 17, 2009. (Pl.'s Resp. 2.) Unihost is a Georgia-based corporation that operated a sports bar called American Pie in Atlanta, but sold the Marks to Plaintiff after it went out of business. (Def.'s Mot. 4.) Plaintiff obtained all rights, title, interest, and goodwill in the assigned Marks. (*Id.*) Prior to obtaining the Marks in April 2008, Plaintiff attempted to register a logo for a pizza buffet restaurant with the USPTO. (Def.'s Mot. Ex. B-3.) Plaintiff argued that their logo would not likely cause confusion with Unihost's registered marks. (*Id.*) The examining attorney, however, refused to register Plaintiff's mark, finding that it was "likely to be confused with [Unihost's] Registrations." (*Id.*)

Defendant is a Minnesota corporation that operates two take-out and home-delivery restaurants in Richfield and Minnetonka, Minnesota under the name American Pie Pizza. (Pl.'s Resp. 3.) Defendant maintains a website with the domain name www.americanpiepizza.org. (*Id.* at 4; Ex. D.) American Pie Pizza Corporation ("APPC") began operating in Minnesota in 2001. (Def.'s Mot. Ex. A, Decl. of Todd Holtan at 2, Sept. 9, 2010.) Defendant made substantial loans to APPC, and acquired the business after APPC defaulted on those loans in 2007. (*Id.*)

---

[1] Although three trademarks were transferred, Plaintiff only continues to use the last two, and they are the only two at issue in this dispute. (Pl.'s Resp. 3.) The three Marks are:

• AMERICAN PIE FOR NON-MEMBERS ONLY! (stylized), Registration No. 1,517602 (filing date Feb. 8, 1988).

• AMERICAN PIE (stylized), Registration No. 2,253,641 (filing date May 15, 1998).

• AMERICAN PIE (word only), Registration No. 2,503,631 (filing date Feb. 11, 2000).

On January 23, 2006, APPC tried to register a service mark for "American Pie Pizza" with the USPTO.[2]  (Pl.'s Resp. 4; Ex. E.)  The examining attorney assigned to review APPC's claim refused to register the mark because "when used on or in connection with the identified goods/services, so resembles [the Marks] as to be likely to cause confusion, or to cause mistake, or to deceive."  (Pl.'s Resp. 4; Ex. F.)  In 2006, the Marks still belonged to Unihost.  Plaintiff did not acquire possession of the Marks until the assignment on July 1, 2008.

On May 12, 2010, Plaintiff sent Defendant a cease and desist letter informing Defendant that it owned the Marks and asking Defendant to stop using them.  (Pl.'s Resp. 5; Ex. H.)  On May 28, 2010, Defendant, through its attorney Robert Gust, responded to the cease and desist letter and explained to Plaintiff that it was looking into the claims and would "have a more complete response to you in the very near future."  (Pl.'s Resp. Ex. I.).  On June 16, 2010, Plaintiff sent another cease and desist letter.  (Pl.'s Resp. Ex. J.)  In the letter, Plaintiff informed Defendant that its use of the Marks was confusing its customers and demanded that Defendant stop using the term "American Pie" in connection with its business and change its website domain name by July 9, 2010.  (*Id.*)

Defendant did not respond to Plaintiff's second letter or provide a fuller response to the first letter.  On July 9, 2010, Defendant filed a declaratory action in the United States District Court for the District of Minnesota (File No. 10-CV-02972-RHK-JJK) (the "Minnesota Action"). (Pl.'s Resp. 5.)  On October 21, 2010, Judge Kyle dismissed Defendant's declaratory action without prejudice, holding personal jurisdiction over Plaintiff was improper because it lacked sufficient contacts with Minnesota.  Plaintiff filed suit against Defendant in this Court on August 5, 2010, for trademark

---

[2] Defendant attempted to register the mark AMERICAN PIE PIZZA (design plus words). Serial No. 78,796,788 (Jan. 23, 2006).  (Pl.'s Resp. Ex. J.)

3

infringement in violation of 15 U.S.C. §§ 1114, 1125(a) and (c), cybersquatting in violation of 15 U.S.C. § 1125(d), unjust enrichment, and unfair competition. (Pl.'s Resp. 5-6). Defendant then filed this Motion to Dismiss, Stay, or Transfer. At the instant hearing, counsel for Defendant withdrew his requests for transfer or stay, given the dismissal of the Minnesota Action.

## II.    DISCUSSION

Defendant moves to dismiss this case for lack of personal jurisdiction. Defendant claims that subjecting it to suit in this Court would violate its Due Process rights because it does not have sufficient minimum contacts with the State of Michigan. Defendant also argues that venue in the Eastern District of Michigan is inappropriate. Each of these claims will be addressed in turn.

### A.    Does The Court Have Personal Jurisdiction Over Defendant?

#### 1.    Standard

A district court has three options when faced with a motion to dismiss for lack of personal jurisdiction. The court may: (1) decide the motion on affidavits alone; (2) permit discovery to help rule on the motion; or (3) conduct an evidentiary hearing to decide any remaining factual questions. *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991) (citing *Serras v. First Tenn. Bank Nat'l Ass'n*, 875 F.2d 1212, 1214 (6th Cir. 1989)). Although the plaintiff always bears the burden of establishing that jurisdiction exists, the method selected by the court to resolve the issue will affect the weight of the burden. *Id.*; *Ford Motor Co. v. Great Domains, Inc.*, 141 F. Supp. 2d 763, 770 (E.D. Mich. 2001).

When the court relies solely on affidavits, the plaintiff need only make a *prima facie* showing that personal jurisdiction exists to defeat a motion to dismiss. *Theunissen*, 935 F.2d at 1458. In such a scenario, the pleadings and affidavits are read in the light most favorable to the plaintiff. *Id.* at

1459. Additionally, the court should not give any weight to the contrary assertions of the non-moving party. *Id.* This prevents out-of-state defendants from denying personal jurisdiction simply by filing affidavits contradicting pertinent jurisdictional facts. *Id.* The defendant's affidavits, however, are not to be completely ignored. They can present factual disputes that merit further investigation before ultimately deciding whether jurisdiction exists. *See, e.g.*, *id.* at 1465 (remanding for an evidentiary hearing because of the "directly contradictory nature of the parties' assertions"). If an evidentiary hearing is held, the plaintiff must demonstrate that jurisdiction is proper by a preponderance of the evidence. *Id.*; *Great Domains*, 141 F. Supp 2d at 771.

### 2. Analysis

In the present case, no statute directly authorizes jurisdiction over Defendant. Accordingly, this Court must determine whether personal jurisdiction would be proper in the State of Michigan. *See* Fed. R. Civ. P. 4(k)(1). Jurisdiction over a non-resident defendant is permitted in Michigan if suit can be brought against the defendant under Michigan's long-arm statute without violating the due process requirements of the Constitution. *Great Domains*, 141 F. Supp. 2d at 771 (quoting *Reyonlds v. Int'l Amateur Athletic Fed'n*, 23 F.3d 1110, 1115 (6th Cir. 1994)) The Michigan Supreme Court has interpreted Michigan's long-arm statute as providing for the broadest grant of jurisdiction consistent with due process. *Sports Auth. Mich., Inc. v. Justballs, Inc.*, 97 F. Supp. 2d 806, 810 (E.D. Mich. 2000) (citing *Sifers v. Horen*, 385 Mich. 195, 198-99 (1971)).

### (a) Michigan's Long-Arm Statute

Michigan's long-arm statute permits the exercise of limited personal jurisdiction over any claim arising out of "[t]he doing or causing an act to be done, or consequences to occur, in the state resulting in an action for tort." Mich. Comp. Laws § 600.705(2) (West 2010). To satisfy this prong

of § 705, either the tortious conduct or the injury it produced must occur in Michigan. *Great Domains*, 141 F. Supp. 2d at 771 (quoting *Green v. Wilson*, 455 Mich. 342, 352 (1997)).

In this case, it is undisputed that none of Defendant's actions took place in Michigan. Defendant's alleged trademark infringement, however, caused injuries that were sustained in Michigan. Trademark infringement causes injury in the state where the trademark owner resides. *See Baird v. Parsons*, 289 F.3d 865, 876 (6th Cir. 2002) (citing *Dakota Indus., Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1388 (8th Cir. 1991))*; Great Domains*, 141 F. Supp. 2d at 771. Plaintiff owns the Marks and is a Michigan corporation with its principal place of business in Warren. (Pl.'s Resp. 2.) Accordingly, Plaintiff has made a *prima facie* showing that Defendant is amenable to suit under Michigan's long-arm statute.

### (b) Due Process Requirements

It is well-established that in order for a court to exert limited personal jurisdiction, the defendant must have "sufficient contacts or ties with the state of the forum to make it reasonable and just according to our traditional conception of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 320 (1945). The Sixth Circuit has repeatedly analyzed three criteria to decide whether a court's exercise of personal jurisdiction over an out-of-state defendant is constitutional:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum to make the exercise of jurisdiction over the defendant reasonable.

*CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1263 (6th Cir. 1996) (citing *S. Mach. Co. v. Mohasco*

*Indus.*, 401 F.2d 374, 381 (6th Cir. 1968)). For the reasons set forth below, Plaintiff has failed to satisfy the first *Mohasco* requirement – that Defendant purposefully avail itself of acting or causing consequences in the State of Michigan. Accordingly, Defendant's motion to dismiss is GRANTED.

### (i) Purposeful Availment

The first *Mohasco* requirement is that an out-of-state defendant purposefully avail himself of the privilege of acting or producing consequences in the forum state. *CompuServe*, 89 F.3d at 1263. This prong is satisfied if the defendant commits acts that "create a 'substantial connection' with the forum state," so that he "should reasonably anticipate being haled into court there." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474-75 (1985)); *see also World-Wide Volkswagon Corp. v. Woodson*, 444 U.S. 286, 295 (1980). The purpose of this requirement is to avoid subjecting defendants to suits in foreign forums based on contacts that are "random," "fortuitous," or "attenuated." *Burger King*, 471 U.S. at 475. The defendant, however, does not need to be physically present in the forum state to meet this test. *Great Domains*, 141 F. Supp. 2d at 772.

It is undisputed that Defendant does not transact business in Michigan and its agents have not so much as even visited the state. Nevertheless, Plaintiff contends that Defendant satisfied the purposeful availment requirement by intentionally directing its alleged tortious conduct – infringement of Plaintiff's Marks – at the State of Michigan. (Pl.'s Resp. 8-9). Plaintiff relies on the "effects test," first articulated by the United States Supreme Court in *Calder v. Jones*. *See* 465 U.S. 783, 789 (1984).

In *Calder*, a professional entertainer filed a libel action in California against the author of an article published in the *National Enquirer*. *Id.* at 784-86. Although the California Court of Appeals found that the defendants lacked sufficient contacts with California to support general

7

jurisdiction, the court concluded that "a valid basis for jurisdiction existed on the theory that [the defendants] intended to, and did, cause tortious injury to [the plaintiff] in California." *Id.* at 787. The Supreme Court affirmed the California court's decision. *Id.* at 791. The Supreme Court held that the defendants could reasonably anticipate being haled into court in California because "their intentional, and allegedly tortious, actions were expressly aimed at California" and could have a devastating affect on the plaintiff in California. *Id.* at 789-90.

Under the effects test, Plaintiff must prove: (1) Defendant intentionally infringed Plaintiff's trademarks; (2) Defendant's acts were expressly aimed at the State of Michigan; and (3) the brunt of Plaintiff's injuries were felt in Michigan. *See Audi AG & Volkswagon of Am., Inc. v. D'Amato*, 341 F. Supp. 2d 734, 746 (E.D. Mich. 2004); *Great Domains*, 141 F. Supp. 2d at 774. Courts have warned, however, that the effects test should be applied with caution because the plaintiff will always feel the effects of an injury in its home state. *See, e.g.*, *Audi AG*, 341 F. Supp. 2d at 746-47.

### (1) Intentional Acts

If a party intentionally commits a tort against another it should anticipate being haled into court in that person's home state. *Audi*, 341 F. Supp. 2d at 747. Using a mark that is universally known to be another entity's trademark indicates intentional infringement. *See, e.g.*, *Audi AG*, 341 F. Supp. 2d at 748 (finding Audi trademark was "widely known"); *Great Domains*, 141 F. Supp. 2d at 774 (finding that the Ford, Jaguar, and Volvo trademarks are well-known throughout most of the world). Similarly, creating several domain names based upon slight variations of a known trademark suggests the infringement was deliberate. *See Weather Underground, Inc. v. Navigation Catalyst Sys., Inc.*, 688 F. Supp. 2d 693, 700 (E.D. Mich. 2009). In *Weather Underground*, the plaintiff satisfied the intentional acts criterion by alleging that the defendant created over forty

domain names derived from common spelling errors a person typing in plaintiff's trademark would make. *Id.*

In this case, it seems that Defendant's predecessor was not intentionally infringing Plaintiff's Marks when it began operating under the name America Pie Pizzeria Corporation in 2001. Even if Unihost had already registered the Marks, "American Pie" is not a widely known trademark like Ford, Volvo, or Audi. *See Audi AG*, 341 F. Supp. 2d at 748; *Great Domains*, 141 F. Supp. 2d at 774. Plaintiff, however, argues that Defendant's use of the Marks is intentional because APPC's application to register a similar mark in 2006 was denied due to its confusing similarity with the Marks. (Pl.'s Resp. 10.) Plaintiff further contends that, at the very least, Defendant's continued use of the Marks after receiving the cease and desist letters it sent on May 5, 2010 and June 16, 2010 is intentional and deliberate. (*Id.* at 11.)

Defendant asserts that intentional infringement requires Plaintiff to demonstrate that it "deliberately adopted a mark similar to that of another as a means of capitalizing on the goodwill of another." (Def.'s Reply Mem. in Supp. of Mot. to Dismiss, Stay, or Transfer 2.) Defendant argues that it was clearly not trying to capitalize on the goodwill Plaintiff or Unihost created through the Marks, and therefore this Court cannot find it intentionally committed a tort against Plaintiff. (*Id.*) Defendant, however, misstates the law. In support of its position, Defendant makes one (incomplete) citation to a single case from the Southern District of New York which does not even support Defendant's claim. *See Kraft Gen. Foods, Inc. v. Allied Old English, Inc.*, 831 F. Supp. 123, 131 (S.D.N.Y. 1993). The *Kraft* court held that demonstrating an intent to capitalize on the goodwill of another is necessary to establish bad faith, which in turn is one of seven factors the Second Circuit uses to determine whether there is a high likelihood of confusion between two marks.

9

*Id.*; *see also Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961). *Kraft* did not speak at all to whether something is done intentionally for purposes of the effects test under *Calder*.

It is unclear whether a defendant satisfies this requirement by continuing to use a mark after discovering it is registered by another entity. *Compare Lifestyle Lift Holding, Inc. v. Md. Plastic Surgery Assocs., LLC*, No. 07-14350, 2008 WL 482695, at *5 (E.D. Mich. Nov. 5, 2008) (satisfies the requirement), *with Visage Spa v. Salon Visage, Inc.*, No. 06-10756, 2006 WL 2130512, at *9 (E.D. Mich. July 28, 2006) (does not satisfy the criteria)*, and See, Inc. v. Imago Eyewear PTY Ltd.*, No. 03-74761, 2004 WL 5569067, at *6 (E.D. Mich. Oct. 12, 2004) (same).

In *Lifestyle Lift*, the plaintiff, a Michigan corporation Lifestyle Life Holding ("LLH"), sued the defendants, Maryland Plastic Surgery Associates, LLC and Dr. Adam Summers, for their use of LLH's trademark "Lifestyle Lift." 2008 WL 482695, at *1. The defendants each maintained websites that used the phrases "lifestyle facelift" or "Lifestyle Lift" to describe the plastic surgery services they offer. *Id*. The defendants also operated or reserved the domain names [www.my-threadlift.com](www.my-threadlift.com), [www.mdcomsetic.com](www.mdcomsetic.com), [www.Lifestyle-facelift.com](www.Lifestyle-facelift.com), and [www.Just-Your.LifestyleFacelift.com.](www.Just-Your.LifestyleFacelift.com) *Id*. LLH sent the defendants letters demanding that they cease and desist using LLH's trademark, but they refused to do so. *Id*.

The court accepted the Magistrate Judge's Report and Recommendation denying the defendants' motion to dismiss for lack of personal jurisdiction. *Id*. The Judge found that although the defendants had no business or personal contacts with Michigan, exercising personal jurisdiction over them was proper under the effects test. *Id*., at *4. The Judge cited three factors that demonstrated the defendants' infringement was intentional: (1) the plaintiff and defendant both

10

provided the same service; (2) the defendants' domain names were very similar to LLH's trademark; and (3) the "[d]efendants continued to display the [m]ark after receiving cease and desist letters from Plaintiff LLH." *Id*., at \*5.

On the other hand, this Court has suggested that continued use may not necessarily constitute intentional infringement for purposes of the effects test. In *Visage Spa*, the plaintiff, a Michigan corporation Visage Spa, claimed the defendants, two Tennessee corporations Spa Visage and Salon Visage, infringed its trademark "Visage Spa" by using a confusingly similar mark, "Spa Visage" on their websites. 2006 WL 2130512, at \*1. The defendants' websites allowed visitors to purchase gift certificates to both the spa and the salon online. *Id.* The defendants claimed to have been using the disputed mark since 2000 while the plaintiff did not register its mark with the USPTO until 2004. *Id.*, at \*2. The defendants were notified of the plaintiff's trademark when the USPTO rejected their application for a similar mark on September 4, 2004. *Id.*, at \*9. The only business related activity the defendants conducted in Michigan was the sale of a single gift certificate to a Michigan resident from the defendant Spa Visage's website. *Id*.

This Court held it had personal jurisdiction over the defendant Spa Visage under the effects test. *Id.*, at \*11. The Court stated that even if the spa had a prior use of the mark, after it was notified that its mark was confusingly similar to the plaintiff's "it was not free to further expand its use of the [m]ark." *Id.*, at \*9. The Court held that the sale of a gift certificate to a Michigan resident was intentional and expressly aimed at the state of Michigan. *Id*.

The Court, however, granted defendant Salon Visage's motion to dismiss, *id*., at \*11, despite the fact that the plaintiff's mark could be viewed on both websites, *id*., at \*1. This suggests that jurisdiction over defendant Spa Visage was predicated on the gift certificate sale to a Michigan

11

resident, and not the injury suffered by a Michigan corporation due to the defendants' alleged trademark infringement.

In *Imago Eyewear*, the plaintiff, a Michigan corporation, sued the defendants Seeyewear Party Ltd. ("Seeyewear") and Steven Ehrlich for infringing its trademarks "See Selective Eyewear Elements," "See," and "See Eyewear." 2004 WL 5569067, at *1. The trademarks were originally filed by DOC Optical Corp., but were later assigned to the plaintiff. *Id*. DOC also registered the domain name www.seeeyewear.com on December 23, 1998. *Id*. Sometime around April 2002, Ehrlich registered the domain name www.sceyewear.com. *Id*. Ehrlich lived in Australia and was the founder and owner of Imago and Seeyewear, both of which are Australian corporations. *Id*. Ehrlich also owned an Autralian Trademark Registration and a World Intellectual Property Organization Trademark Registration for "Seeyewear." *Id.*

This Court held that the plaintiff did not satisfy the effects test because it could not show that the defendants' use of its trademarks was intentional. *Id.*, at *6. The Court emphasized that the defendant had a legitimate preexisting use for the domain name because of its valid registration in Australia. *Id.* Furthermore, the plaintiff did not allege that the defendants deliberately registered its domain name. *Id.*

The Court was unpersuaded by the plaintiff's claim that the defendants satisfied the intentional acts prong by continuing to operate their websites after receiving plaintiff's cease and desist letters. *Imago Eyewear*, 2004 WL 5569067, at *8. The Court held the defendant's "knowledge" that its trademarks might be disputed in the United States was different than the knowledge required under the intentional acts and expressly aimed at prongs of the effects test. *Id.* The Court focused on the defendants' state of mind when they first registered their domain name

12

and posted the website as the relevant point in time to assess when determining whether they intentionally infringed plaintiff's mark. *See id.* Finding that the defendants were not even aware of the plaintiff's trademarks before the cease and desist letters, the Court went on to hold "[t]he fact that [the defendants] continued to use its domain name after the cease and desist letter of October 8, 2003 is irrelevant to this analysis because they had a preexisting legitimate use of its trademark and domain name." *Id.*

In the instant case, Defendant's actions were intentional and therefore satisfy the first requirement of the effects test. While the cases are unclear as to whether continued use of a trademark after discovering it is registered to another entity and/or receiving cease and desist letters from the mark's owner always constitutes an "intentional act," in this case the Court finds deliberateness. Defendant continued to use its mark after the USPTO refused to register it knowing it was confusingly similar to preexisting trademarks.[3] Unlike the defendants in *Imago Eyewear*, Defendant did not have a preexisting trademark registration. *See* 2004 WL 5569067, at *6. Although Defendant may have had a legitimate prior use from 2001-2006, after ACCP's application was rejected by the USPTO, it was put on notice that it was not the registered owner of the Mark. *See Lifestyle Lift*, 2008 WL 482695, at *5.

*Visage Spa*, however, suggests that Defendant does not satisfy the intentional acts prong.

---

[3]Defendant argues that the legal standard for trademark infringement is different than obtaining a new registration with the USPTO, suggesting that the denial of ACCP's application in 2006 does not necessarily mean that continued use of the Marks constitutes infringement. (Def.'s Mot. 3.) Even if this is true (Defendant cites no support for its proposition), it is irrelevant to the Court's analysis of this motion because the argument speaks to the merits of the case – Plaintiff's infringement claim. To defeat a motion to dismiss, however, Plaintiff need only make a *prima facie* showing that jurisdiction exists, and the Court must make all inferences in favor of Plaintiff. *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991).

*See* 2006 WL 2130512, at *9. The defendant Visage Salon's motion to dismiss was granted even though it continued to use the plaintiff's trademark on its website and it was aware the plaintiff owned the mark after its application to register a similar mark was rejected by the USPTO. *Id.* The Court did not articulate what part of the effects test the defendant Visage Salon failed to satisfy, but the opinion as a whole suggests that it most clearly failed the expressly aimed at prong. *See id.*, at *6 (holding that simply registering an infringing domain name without more is insufficient to demonstrate the defendant's activities were directed at the forum state). Accordingly, the Court holds that Defendant satisfied the intentional acts requirement.

### (2) Expressly Aimed at the Forum State

The next factor under the effects test is whether Defendant's actions were expressly aimed at the State of Michigan. *Audi AG*, 341 F. Supp. 2d at 746; *see also Calder v. Jones*, 465 U.S. 783, 789 (1984). Courts have struggled to define precisely what satisfies this prong and noted that because of wide-ranging access to the internet, application of the effects test to infringement involving domain names is particularly difficult. *See, e.g.*, *Great Domains*, 141 F. Supp. 2d at 774. Injury to a forum resident, standing alone, however, is not enough. *Weather Underground*, 688 F. Supp. 2d at 700 (citing *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 552 (6th Cir. 2008)). There must be "something more" to demonstrate the defendant directed his activity toward the forum state. *Id.* (quoting *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1322 (9th Cir. 1998)); *see also Imago Eyewear*, 2004 WL 5569067, at *7 (detailing the "something more" in several cases). Simply registering someone else's trademark as a domain name is insufficient to exert jurisdiction over an out-of-state defendant. *Audi AG*, 341 F. Supp. 2d at 746 (quoting *Panavision*, 141 F.3d at 1322); *Great Domains*, 141 F. Supp. 2d at 775 ("[I]ncorporating a famous

14

mark into a domain name cannot always be deemed proof that registration of the domain name was expressly aimed at the trademark owner.")

Even a showing that the defendant knew about the plaintiff's registered trademark and deliberately infringed upon it will not necessarily satisfy the expressly aimed at prong. *See, e.g.*, *Providers Access & Sav. Sys., Inc. v. Regence Group, Inc.*, No. 06-15367, 2007 WL 1106145, at *7 (E.D. Mich. Apr. 12, 2007); *Visage Spa*, 2006 WL 2130512, at *11; *but see Lifestyle Lift*, 2008 WL 482695, at *5.

In *Providers Access*, the plaintiff Providers Access and Saving Systems owned the registered trademark "MedAdvantage." 2007 WL 1106145, at *1. Plaintiff MedAdvantage LLC was the exclusive licensee of the MedAdvantage mark and used it as the name of a program it ran that offered discount health care plans to members. *Id.* As part of the program, participants were given a card called the "MedAdvantage Card" which entitled members to discounts on various services and prescription drugs. *Id.*

The plaintiffs sued the defendant, a non-profit company headquartered in Oregon, for trademark infringement. *Id.*, at *2. Through affiliate corporations, the defendant began offering medical insurance plans in 2005 predicated on changes Congress made in the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (the "2003 Act"). *Id.* The defendant was only authorized by the government to market its program to Medicare recipients living in certain counties in Oregon, Washington, Utah, and Idaho. *Id.* The defendant was required, however, to terminate coverage for members who stay outside the area serviced by the defendant for more than six months. *Id.*, at *7 The defendant's plans were called "MedAdvantage" and "MedAdvantage + Rx." *Id.*, at *2. The defendant argued that the plans' names were based on Congress' decision to change the

15

name of the "Medicare+Choice" program to "Medicare Advantage" in the 2003 Act. *Id.* The defendant presented evidence that the term "MedAdvantage" had become a generic, shorthand reference to the "Medicare Advantage" program of the 2003 Act. *Id.*, at \*7. The defendant also operated a website through which it advertised and marketed its products.[4]

Judge Duggan granted the defendant's motion to dismiss because the plaintiffs failed to satisfy the effects test. *Id.*, at \*8. Although the court found no evidence that the defendant was aware the plaintiff had trademarked the term MedAdvantage, it held that "even if the Court assumes that [the defendant] had actual or constructive knowledge of [the plaintiff's] ownership of the MedAdvantage marks and deliberately infringed those marks" it did not believe the plaintiff had made a *prima facie* showing that the defendant's conduct was "aimed at Michigan based simply on that knowledge and [p]laintiffs' presence in the forum." *Id.*, at \*7 (quotation marks omitted). The court noted, "something more is necessary to demonstrate that the defendant's actions were aimed at the forum state than use of a mark knowing that the owner of the mark lives in the forum." *Id.*

Judge Duggan held that the plaintiff could not identify the "something more." *Id.*, at \*8. Although the defendant's website could be accessed in Michigan, the defendant did not offer insurance plans to Michigan residents. *Id.* Additionally, the court found that any contact between Michigan and participants of the defendant's plans (and the cards they carry) resulted from the fortuitous acts of the members and not any intentional act of the defendant. *Id.*

In *Great Domains*, the court stated that two factors were relevant when determining whether registering a domain name is "expressly aimed" at a trademark owner: (1) the likelihood of

---

[4] The name of defendant's website was not mentioned in the case although the court found that the plaintiff's website used the plaintiff's marks. *Id.*, at \*8.

16

confusion as to who controls the website; and (2) the level of individualized targeting of the registered owner.[5]  141 F. Supp. 2d at 776.  The factors are inversely proportional to each other, so a high likelihood of confusion will reduce the level of targeting required.  *Id.*

When assessing the likelihood of confusion, two factors should be considered.  First, are there other legitimate uses for the domain name?  Second, what role does the trademark play in the lexical context of the name?  *Id.*  It is important to determine the likelihood of confusion based on the domain names alone.  This is because domain names are the major identifying feature of a website.  *Id.*  As a result, "if the mark itself causes confusion, mitigating information or activity on the webpage may be insufficient to demonstrate a noninfringing use."  *Id.*  Furthermore, while distinctions in the domain name's extension (e.g. ".com," ".org," or ".edu") are relevant to the analysis, such distinctions are not necessarily dispositive of the domain's purpose or character.  *Id.* at 776 n.6.

Factors to consider when evaluating the level of individual targeting are: (1) whether the defendant solicited the trademark owner to buy the domain name; (2) whether the defendant registered domain names using other trademarks; (3) whether the defendant offered to sell the domain name at issue, and if so, for what price; (4) whether the defendant had a legitimate preexisting use for the domain name; and (5) any other relevant factors tending to demonstrate the registration was expressly aimed at the forum state.  *Id.* at 777; *see also Audi AG*, F. Supp. 2d at 747.

---

[5] It should be noted that Plaintiff argues that Defendant's use of the trade name "American Pie Pizza" also constitutes infringement, and therefore does not rest its claim solely on Defendant's domain name.  (Pl.'s Resp. 4).  Plaintiff does, however, reference the domain name several times throughout its response (*id.* at 4, 9, 11, 12) and cites exclusively to *Great Domains* and *Audi AG*, two cases dealing with domain names, in arguing that Defendant's conduct is expressly aimed at Michigan.  (*Id.* at 12.)  Additionally, when discussing the confusion Defendant has caused, Plaintiff relies primarily on the websites.  (*Id.*; Ex. C ¶ 4.)

In the case at bar, Plaintiff argues that Defendant's actions clearly satisfy the expressly aimed at requirement under the factors articulated by *Great Domains*. Indeed, many factors favor Plaintiff's contention. First, it is likely that Defendant's domain name causes a high likelihood of confusion as to who controls which website. The only differences between the two domain names is that Defendant's is singular and ends in ".org" instead of ".com." (Pl.'s Resp. 12.) The distinction between "americanpiepizza" and "americanpiepizzas" is so slight that the average internet user is unlikely to differentiate the two. The fact that Defendant's website clearly suggests that Plaintiff, a Michigan corporation, probably does not own two pizza places in small Minnesota towns, and therefore does not operate the website, is insignificant. *See Great Domains*, 141 F. Supp. 2d at 776 (explaining that what matters is the confusion caused by the domain name). Additionally, the difference in the two domain names' endings (".com" and ".org") is insufficient to avoid confusion. *See id.* at 776 n.6. This conclusion is bolstered by the fact that the USPTO rejected Defendant's attempt to register its service marks because they were confusingly similar to Plaintiff's Marks. (Pl.'s Resp. 4; Ex. F.)

Because there is a high likelihood of confusion, a lower level of individualized targeting is required. *Great Domains*, 141 F. Supp. 2d at 776. Here, however, there is virtually no level of targeting. Defendant did not attempt to solicit Plaintiff to buy the name, has not owned other infringing domain names before, and has not offered to sell the name to a third party. It is difficult to judge whether Defendant had a legitimate preexisting use. Defendant's predecessor ACCP did when it used the name from 2001-2006. Up until then, ACCP did not know it was using a confusingly similar service marks to the Marks Plaintiff now owns. After its application with the USPTO was rejected, however, ACCP (and then Defendant when it took over ACCP's operations)

18

knew that there was a significant possibility that the continued use of the name American Pie Pizza constituted trademark infringement.

The Court holds that Defendant's activities are not expressly aimed at the State of Michigan. Plaintiff has not demonstrated the "something more" required by the majority of courts analyzing whether a defendant expressly aimed its conduct at the forum state. *See, e.g.*, *Weather Underground*, 688 F. Supp. 2d at 700 (quoting *Panavision*, 141 F.3d at 1322); *Providers Access*, 2007 WL 1106145, at *7; *Imago Eyewear*, 2004 WL 5569067, at *7. Even though Defendant eventually learned that the Marks' owner was located in Michigan, the Court agrees with the *Providers Access* court which held such knowledge alone was insufficient to satisfy this requirement. 2007 WL 1106145, at *7. Defendant did not transact any business in Michigan or to Michigan residents through its website. *See Visage Spa*, 2006 WL 2130512, at *9. Plaintiff's Marks were not well-known, such that Defendant should have known it was infringing upon them when it began using them. *See Great Domains*, 141, F. Supp. 2d at 777. Finally, Defendant did not attempt to capitalize on the goodwill created by Plaintiff's use of the Marks. *See Weather Underground*, 688 F. Supp. 2d at 701; *Audi AG*, 341 F. Supp. 2d at 747-48. Because Plaintiff cannot identify "something more" besides Defendant's use of its trademarks for a domain name, Plaintiff has failed to establish that Defendant's activities were expressly aimed at the State of Michigan.

### (3) Brunt of the Injury

Finally, the plaintiff must establish that the brunt of its injuries were felt in the forum state. *Audi AG*, 341 F. Supp. 2d at 746; *see also Calder v. Jones*, 465 U.S. 783, 789 (1984). This factor is clearly satisfied because Michigan is the only state where Plaintiff's injuries would occur. Plaintiff is a Michigan corporation that only operates restaurants and licenses its Marks in Michigan.

Because Defendant's actions were not expressly aimed at the State of Michigan, however, Plaintiff is unable satisfy the effects test and therefore has failed to demonstrate that Defendant purposefully availed itself of Michigan's laws or courts. Since Plaintiff must establish all three *Mohasco* factors and the Court holds that it cannot meet the purposeful availment prong, it is unnecessary to consider the other two. Similarly, the Court will not address Defendant's venue claim, which is now moot.

### III. CONCLUSION

Although Defendant is amenable to suit under Michigan's long-arm statute, exercising personal jurisdiction over Defendant would violate the Due Process requirements of the Constitution. Plaintiff has failed to demonstrate that Defendant's alleged infringement was expressly aimed at the State of Michigan. Plaintiff cannot show that Defendant purposefully availed itself of acting or producing consequences in Michigan because Defendant's activity was not sufficient focused on the state under the expressly aimed at prong of the effects test. Accordingly, Defendant's motion to dismiss for lack of personally jurisdiction is **GRANTED**.

**SO ORDERED**.

S/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: January 31, 2011

### CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on January 31, 2011.

S/Denise Goodine
Case Manager